IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT W. CLOUGH, II on behalf of himself and others similarly situated, | : : : |
| Plaintiff, | : Case No. 1:17-cv-00411-PB : |
| v. | : : CLASS ACTION COMPLAINT : |
| REVENUE FRONTIER, LLC, U.E.G. INCORPORATED, SUPREME DATA CONNECTIONS, LLC, and WILLIAM ADOMANIS | : : : : : |
| Defendants. | : : |
| _____/ | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.  Plaintiff Robert W. Clough, II ("Mr. Clough" or "Plaintiff") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

### Parties

2.  Mr. Clough is a resident of the state of New Hampshire and this District.

3.  Revenue Frontier, LLC ("Revenue Frontier") is a company with its principal place of business in Santa Monica, CA. Revenue Frontier engages in telemarketing nationwide, including into this District.

4.  U.E.G. Incorporated ("UEG") is a Texas corporation that conducts business in this District. It has a principal place of business at 270 Oak Trail Dr. in Lewisville, TX 75077,

and a registered agent of Justin Collins at the same address. Revenue Frontier retained UEG to assist in the telemarketing campaign at issue.

5. Supreme Data Connections, LLC ("Supreme Data") is a Florida limited liability company that conducts business in this District. Supreme Data has a principal place of business at 7116 Pine Bluff Drive in Lake Worth, FL, 33467. Supreme Data worked with UEG to carry out the telemarketing campaign at issue on behalf of Revenue Frontier.

6. William Adomanis is an adult individual who is the manager and registered agent of Supreme Data. Mr. Adomanis was personally involved in the telemarketing campaign at issue.

## Jurisdiction & Venue

7. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the telemarketing call to the Plaintiff was placed into this District.

## The Telephone Consumer Protection Act

9. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The National Do Not Call Registry

10. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers.

*See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

11. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

12. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

13. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

14. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

15. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

16. A text message is a "call" for purposes of the TCPA.

17. Unlike more conventional advertisements mobile text spam can actually cost their recipients money, because cell phone users must frequently pay their respective wireless service providers either for each text message call they receive or incur a usage allocation deduction to their text plan, regardless of whether or not the message is authorized.

18. Under the TCPA, an individual such as William Adomanis, may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*.

47 U.S.C. § 217 (emphasis added).

19. When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See, e.g., Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985,

4

*10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

20. Defendant William Adomanis is personally liable under the "participation theory" of liability because he was the controlling officer of Supreme Data, knew of Supreme Data's violations, and directed any agents of Supreme Data to continue making those violations. Furthermore, William Adomanis is also personally liable because he was responsible for ensuring compliance for Supreme Data, including TCPA compliance.

## Factual Allegations

21. Revenue Frontier is in the business of lead generation to originate new customers for the companies it works for. Relevant here, the illegal calls at issue were made by Revenue Frontier, and entities it retained to facilitate such calls, that were ultimately for the benefit of Revenue Frontier's client, National Tax Experts, Inc. ("NTE").

22. To generate new clients, Revenue Frontier relies on telemarketing, which is conducted by third parties.

23. For the call to Mr. Clough, these third parties included U.E.G. and Supreme Data.

24. UEG and Supreme Data solicited new customers for Revenue Frontier by using an automatic telephone dialing system ("ATDS") to transmit text messages.

25. ATDS equipment is typically used in the telemarketing industry because it allows for thousands of automated calls to be placed at one time, but telemarketing representatives who

are paid by the hour, only talk to individuals who pick up the telephone or respond to the text contact through a telephone call.

26. Through this method, the defendants shift the burden of wasted time to the consumers it calls with unsolicited messages.

27. Plaintiff is, and at all times mentioned herein, a "person" as defined by 47 U.S.C. § 153(39).

28. Mr. Clough placed his cellular telephone number, 603-731-XXXX on the National Do Not Call Registry in February of 2008.

29. Despite taking the affirmative step of registering his telephone number on the National Do Not Call Registry, Revenue Frontier hired U.E.G. who commissioned Supreme Data to place an automated text message to him on June 14, 2017.

30. The text message stated, "Hi, Did you ever take care of your IRS/State Tax Debt? I can eliminate back taxes, penalties, liens, levies…Call us for help".

31. Mr. Clough does not and did not owe any back federal or state taxes.

32. The Caller ID that sent the automated text message was (888) 309-8543.

33. Other individuals have complained about being contacted by that number. In fact, two individuals previously indicated that they received spam contacts from that number, with one complaint being filed on the same day that the Plaintiff received his automated text message. *See* https://checkwhocalled.com/phone-number/1-888-309-8543 (Last Visited November 27, 2017).

34. Other websites have also compiled complaints about telemarketing contact from this Caller ID number. *See* http://callername.com/8883098543 (Last Visited November 27, 2017) (aggregating complaints about "unsafe" calls from that Caller ID number.

6

35. The prior complaints, the fact that Mr. Clough did not owe back taxes, the lack of a specific addressee for the text, the generic nature of the text message, as well as the geographic distance between the sender and the Plaintiff, are all facts that are consistent with a broad, generic, nationwide telemarketing campaign conducted via ATDS.

36. The text message sent to Mr. Clough did not identify the legal name of the entity that was soliciting his business.

37. To identify the calling party, Mr. Clough called the number back that sent him the text message.

38. When the Plaintiff finally connected with a live individual, he was solicited for services from an individual named "Paul" who claimed he worked for "National Tax."

39. To ensure that he could properly identify the entity that was calling, Mr. Clough continued to engage with the telemarketing sales representative and ultimately requested and received an e-mail that included a contract definitively identifying National Tax Experts as the entity whose goods or services were being promoted. To protect his private confidential information, Mr. Clough told the telemarketing sales representative that his name was Robert.

40. After Mr. Clough conclusively identified NTE as the entity whose goods or services were being solicited via text message, Mr. Clough through counsel wrote to NTE, informed it of the illegal call, and inquired as to whether it had his prior express written consent to send him unsolicited text messages.

41. In response, NTE identified Revenue Frontier as the entity responsible for the text at issue. Revenue Frontier, in turn, admitted it was responsible for sending the text at issue but claimed Mr. Clough "consented" to receive such a text by visiting a web site called http://freeconsult.ustaxshield.com/owe-irs-back-tax.

7

42. Mr. Clough never visited this web site or consented to receive telemarketing calls from NTE or from any of the defendants. This web site also appears to have nothing to do with NTE or any of the other defendants.

43. After it retained counsel, NTE changed its story and claimed that Mr. Clough "consented" to receive text messages by visiting another web site called http://tax.smartwalletnow.com.

44. Mr. Clough never visited this web site or consented to receive telemarketing calls from NTE or from any of the defendants.

45. Plaintiff and the other call recipients of the unsolicited text messages at issue in this case were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up, they were charged for the calls and their privacy was improperly invaded.

46. Moreover, these calls injured plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of plaintiff and the class.

47. The text itself also did not identify the entities responsible for the text, thereby requiring Mr. Clough to conduct his own investigation to identify the parties at issue.

### Revenue Frontier's Liability for the Telemarketing Call

48. Revenue Frontier is a "person," as defined by 47 U.S.C. § 153(39).

49. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

50. In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message calls sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

51. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as Revenue Frontier may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

52. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

53. The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

54. Revenue Frontier is legally responsible for ensuring that the companies it hired, U.E.G and Supreme Data, complied with the TCPA, even if Revenue Frontier did not itself make the calls.

55. Revenue Frontier knowingly and actively accepted business that originated through the illegal telemarketing calls from U.E.G and Supreme Data.

56. By hiring a company to make calls on its behalf, Revenue Frontier "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

57. Similarly, by accepting these contacts, U.E.G and Supreme Data "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of Revenue Frontier, as described in the Restatement (Third) of Agency. As such, U.E.G Incorporated and Supreme Data Connections are agents of Revenue Frontier.

58. Moreover, Revenue Frontier maintained interim control over U.E.G and Supreme Data.

59. For example, Revenue Frontier had absolute control over whether, and under what circumstances, it would accept a customer.

60. Furthermore, Revenue Frontier had day-to-day control over U.E.G and Supreme Data, including the ability to prohibit it from using an ATDS to contact potential customers of Revenue Frontier. Revenue Frontier failed to make such an instruction to U.E.G and Supreme Data, and as a result, is liable for their conduct.

61. Revenue Frontier also gave interim instructions to U.E.G and Supreme Data by providing the volume of calling and leads it would purchase.

62. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

### Class Action Allegations

63. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

64. The class of persons Plaintiff proposes to represent is tentatively defined as:

All persons within the United States: (a) Each defendant and/or a third party acting on their behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) using an automatic telephone dialing system or an artificial or prerecorded voice; and (d) at any time in the period that begins four years before the date of filing this Complaint to trial.

65. Excluded from the classes are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

66. The class as defined above is identifiable through phone records and phone number databases.

67. The potential class members number at least in the thousands, since automated and pre-recorded telemarketing campaigns make calls to hundreds or thousands of individual a day. Individual joinder of these persons is impracticable.

68. Plaintiff is a member of the proposed class.

69. There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

    a. Whether Defendants violated the TCPA by using automated telemarketing to call cellular telephones;

    b. Whether Defendants placed calls without obtaining the recipients' prior express signed consent in writing for the call;

    c. Whether the Plaintiff and the class members are entitled to statutory damages because of Defendants' actions.

70. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the Class arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories.

71. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the classes, he will fairly and adequately protect the interests of the classes, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

72. Common questions of law and fact predominate over questions affecting only individual class members. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or its agents.

73. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated.  Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for

small claimants, and deters illegal activities.  There will be no significant difficulty in the management of this case as a class action.

74.     The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

75.     Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

**Legal Claims**

**Count One:**
**Violation of the TCPA's Automated Calling provisions**

76.     Plaintiff Clough incorporates the allegations from all previous paragraphs as if fully set forth herein.

77.     The foregoing acts and omissions of Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the cellular telephone numbers of Plaintiff and members of the Class using an ATDS and/or artificial or prerecorded voice.

78.     As a result of Defendants' and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Class presumptively are entitled to an award of $500 in damages for each and every call made to their cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

79.     Plaintiff and members of the Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls, except for

emergency purposes, to any cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in the future.

80. The Defendants' violations were negligent and/or knowing.

### Relief Sought

For himself and all class members, Plaintiff request the following relief:

A. Certification of the proposed Class;

B. Appointment of Plaintiff as representative of the Class;

C. Appointment of the undersigned counsel as counsel for the Class;

D. A declaration that Defendants and/or its affiliates, agents, and/or other related entities' actions complained of herein violate the TCPA;

E. An order enjoining Defendants and/or its affiliates, agents, and/or other related entities, as provided by law, from engaging in the unlawful conduct set forth herein;

F. An award to Plaintiff and the Class of damages, as allowed by law;

G. Leave to amend this Complaint to conform to the evidence presented at trial; and

H. Orders granting such other and further relief as the Court deems necessary, just, and proper.

**Plaintiff request a jury trial as to all claims of the complaint so triable.**

PLAINTIFF,
By its attorneys

*/s/ Roger B. Phillips*
Roger B. Phillips, (Bar. No. 2018)
Phillips Law Office, PLLC
104 Pleasant Street
Concord, NH 03301
(603) 225-2767 (ph)
(603) 226-3581 (fax)

roger@phillipslawoffice.com

Anthony I. Paronich
Broderick & Paronich, P.C.
99 High St., Suite 304
Boston, MA 02110
(508) 221-1510
anthony@broderick-law.com
*Pro Hac Vice*

Alex M. Washkowitz
Jeremy Cohen
CW Law Group, P.C.
188 Oaks Road
Framingham, MA 01701
alex@cwlawgrouppc.com
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, hereby certify that on December 1, 2017, I filed the foregoing with the Court's CM/ECF system, which served the same on the counsel of record.