**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| ROBERT W. CLOUGH, II., individually and on behalf of a class of all persons and entities similarly situated, | ) ) ) | Case No. 1:17-cv-00411-PB |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
| REVENUE FRONTIER, LLC, SUPREME DATA CONNECTIONS, LLC and WILLIAM ADOMANIS, | ) ) ) |  |
| Defendants. |  |  |

**PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS**
**ACTION SETTLEMENT AND INCORPORATED MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  NATURE AND BACKGROUND OF THE CASE ...............................................2

III.  THE PROPOSED SETTLEMENT ......................................................................5

    A.  Opt-Out and Objection Procedures............................................................5

    B.  Release .......................................................................................................6

    C.  Class Representative Incentive Award .......................................................6

    D.  Attorneys' Fees and Costs .........................................................................6

    E.  Remaining Funds .......................................................................................7

IV.  NOTICE AND SETTLEMENT ADMINISTRATION........................................7

V.  The Settlement Agreement Should Be Preliminarily Approved As Fair, Reasonable And Adequate ..................................................................................................9

    A.  The Settlement Resulted From Arm's Length Negotiations -- It is Not the Product of Collusion ................................................................................11

    B.  The Factual Record Was Well Developed Through Independent Investigation ...12

    C.  The Settlement Was Negotiated by Experienced Counsel ......................13

    D.  Continued Litigation Came With Significant Risks ...............................13

VI.  The Court Should Certify a Settlement Class ....................................................18

    A.  Rule 23(a)'s Requirements Are Satisfied ...............................................18

        1.  Numerosity.....................................................................................18

        2.  Commonality...................................................................................19

        3.  Typicality .......................................................................................19

        4.  Adequacy of Representation ..........................................................20

    B.  Rule 23(b)'s requirements are satisfied ..................................................21

        1.  Predominance...................................................................................21

        2.  Superiority.......................................................................................22

VII.  SCHEDULE OF EVENTS .................................................................................23

VII.  CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adair v. Sorenson*,
    134 F.R.D. 13 (D. Mass. 1991)..............................................................20

*Aliano v. Joe Caputo & Sons – Algonquin, Inc.*, No. 09-910, 2011 WL 1706061
    (N.D. Ill. May 5, 2011) ..............................................................16

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................ *passim*

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985)..................................................................21

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) ..................................................................

*Berman v. Narragansett Racing Ass'n, Inc.*,
    414 F.2d 311 (1st Cir. 1969)..................................................................21

*Burstein v. Applied Extrusion Technologies, Inc.*,
    153 F.R.D. 488 (D. Mass. 1994)..............................................................20

*Carson v. American Brands, Inc.*,
    450 U.S. 79 (1981)................................................................ 10-11

*City Pshp. Co. v. Atlantic Acquisition*,
    100 F.3d 1041 (1st Cir. 1996)..................................................................9

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003)..................................................................8

*Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119, 121 (3d Cir. 2018) ..............................................................15

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    177 F.R.D. 54 (D. Mass. 1997)..................................................19, 21, 22

*Durrett v. Housing Auth. of City of Providence*,
    896 F.2d 600 (1st Cir. 1990)..................................................................10

*East Texas Motor Freight System, Inc. v. Rodriguez*,
    431 U.S. 395 (1977)..................................................................20

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 159 (1974)..................................................................7

*In re Employee Benefit Plans Secs. Litig.*,
  No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) ....................................................9

*Gadelhak v. AT&T Services, Inc.*, 7th Circuit Court of Appeals, Action No. 19-
  1739 (February 19, 2020) ........................................................................................................16

*Garcia v. Johanns*,
  444 F.3d 625 (D.C. Cir. 2006) ................................................................................................22

*Gary v. TrueBlue, Inc.*, Case No. 17-cv-10544, 2018 WL 3647046 (E.D. Mich.
  Aug. 1, 2018) ..........................................................................................................................16

*Glasser v. Hilton Grand Vacations, LLC, 202 U.S. App. LEXIS 2481* (January 27,
  2020) .......................................................................................................................................16

*Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 U.S. Dist. LEXIS
  144501, at *6-9 (E.D. Mo. Sep. 7, 2017) ........................................................................ 17-18

*Gorsey v. I.M. Simon & Co.*,
  121 F.R.D. 135 (D. Mass. 1988)..............................................................................................19

*Grace v. Perception Technology, Inc.*,
  128 F.R.D. 165 (D. Mass. 1989)..............................................................................................23

*Greenspun v. Bogan*,
  492 F.2d 375 (1st Cir. 1974).....................................................................................................8

*Guckenberger v. Boston Univ.*,
  957 F. Supp. 306 (D. Mass. 1997) ...........................................................................................20

*Hatisberry v. Lee*,
  311 U.S. 32 (1941)...................................................................................................................19

*Herrick v. GoDaddy.com LLC*, No. CV-16-00254-PHX-DJH, 2018 WL 2229131
  (D. Ariz. May 14, 2018) ..........................................................................................................16

*Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ........................................................................11

*Keyes v. Ocwen Loan Servicing*, No. 17-cv-11492, 2018 U.S. Dist. LEXIS
  138445 (E.D. Mich. Aug. 16, 2018..........................................................................................16

*King v. Time Warner Cable Inc.*, 894 F.3d 473 (2d Cir. 2018) ...................................................15

*Krimes v. JPMorgan Chase Bank, N.A.*,
  No. 15-5087, 2017 U.S. Dist. LEXIS 79434 (E.D. Pa. May 24, 2017)...................................18

*Lazar v. Pierce*,
  757 F.2d 435 (1st Cir. 1985)......................................................................................................9

*In re Lupron Mktg. and Sales Practices Litig.*,
   228 F.R.D. 75 (D. Mass. 2005) ........................................................................9

*Manchaca v. Chater*,
   927 F. Supp. 962 (E.D. Tex. 1996) ................................................................13

*Marshall v. CBE Group, Inc*., Case No. 2:16-cv-02046-GMN, 2018 WL 1567852
   (D. Nev. Mar. 30, 2018) ................................................................................16

*Miller v. Republic Nat'l Life Ins. Co.*,
   559 F.2d 426 (5th Cir. 1977) ..........................................................................9

*Milstein v. Huck*,
   600 F. Supp. 254 (E.D.N.Y. 1984) ................................................................13

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ......................................................................................7-8

*Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015) .......................2

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ......................................................................................19

*Payne v. Goodyear Tire & Rubber Co.*,
   216 F.R.D. 21 (D. Mass. 2003) ......................................................................19

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ..........................................................................9

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ......................................................................................23

*Phillips Randolph Enters., LLC v. Rice Fields*, No. 06-4968, 2007 WL 129052
   (N.D. Ill. Jan. 11, 2007) ................................................................................16

*Pinkus v. Sirius XM Radio, Inc.*, No. 16 C 10858, 2018 U.S. Dist. LEXIS 125043
   (N.D. Ill. July 26, 2018) ............................................................................14-16

*In re Polymedia Corp. Sec. Litig.*,
   224 F.R.D. 27 (D. Mass. 2004) ......................................................................19

*Randle v. SpecTran*,
   129 F.R.D. 386 (D. Mass. 1988) ....................................................................23

*Rossini v. Olgivy & Mather, Inc.*,
   798 F.2d 590 (2d Cir. 1986) ..........................................................................22

*Swack v. Credit Suisse First Boston*,
   230 F.R.D. 250 (D. Mass. 2005) ................................................................19, 20

*Synfuel Techs., Inc.*, v. DHL Express (USA), Inc. 463 F.3d 646, 653 (7th Cir. 2006) ....................................................................................................................11

*In re Warner Communications Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) ....................................................................13

*Waste Mgt. Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000) .............................................................................22

**Statutes**

47 U.S.C. § 227.................................................................................... *passim*

47 U.S.C. § 227(b) ..............................................................................................2

**Other Authorities**

Fed. R. Civ. P. 23...............................................................................................11

Fed. R. Civ. P. 23(a) ..........................................................................................19

Fed. R. Civ. P. 23(a)(1)......................................................................................19

Fed. R. Civ. P. 23(a)(2)......................................................................................19

Fed. R. Civ. P. 23(a)(3)......................................................................................20

Fed. R. Civ. P. 23(a)(4)......................................................................................21

Fed. R. Civ. P. 23(b) ..........................................................................................21

Fed. R. Civ. P. 23(b)(3)................................................................................ 21-23

Fed. R. Civ. P. 23(e) ...........................................................................10, 11, 18

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778......................22

H. Newberg, A. Conte, Newberg on Class Actions (4th ed. 2002) ....................................9, 10, 12

## I.     INTRODUCTION

This Class Action Settlement Agreement and Release is entered into between and among Plaintiff Robert W. Clough, II ("Plaintiff") on behalf of himself and all Settlement Class Members as defined herein; Defendants Revenue Frontier, LLC ("Revenue Frontier"), Supreme Data Connections, LLC ("Supreme Data"), and William Adomanis ("Adomanis") (collectively "Defendants"); and W4, LLC ("W4").  Plaintiff, Defendants and W4 are referred to collectively in this Settlement Agreement as the "Parties."[1] The Settlement includes the establishment of an $2,100,000 Settlement Fund to be distributed to Settlement Class Members without the need to file claim forms, and to cover Plaintiff's Counsel fees and costs, and an incentive award to the Plaintiff .[2] There is no reverter to the Defendant of any portion of the Settlement Fund. Notice will be effectuated through postcards mailed directly to Settlement Class Members identified in records obtained in discovery and through internet advertising targeted to Settlement Class Members on Google and Facebook. For any class members for whom an address is not known and therefore would not automatically receive a check if they do not opt out, they may submit a Claim Form by mail or through the Settlement Website established by the Settlement Administrator.

The Settlement was reached by counsel with a keen understanding of the merits of the claim and extensive experience in actions brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The parties negotiated the Settlement over the course of three mediations with a highly skilled and experienced mediator, which included the exchange of detailed mediation statements. The relief provided meets the applicable standards of fairness when

---

[1] The Defendants and W4 do not oppose this motion insofar as they support the settlement. The Defendants and W4 do not concede or admit Plaintiff's assertions.

[2] All capitalized terms not defined herein have the meanings set forth in the Parties' Class Action Settlement Agreement ("Settlement" or "Agreement"), attached as Exhibit 1.

taking into consideration the nature of Plaintiff's claims and the risks inherent in class litigation. Plaintiff respectfully requests that the Court: (1) grant preliminary approval of the Settlement; (2) provisionally certify the proposed Settlement Class; (3) appoint Plaintiff's attorneys as Settlement Class Counsel; (4) appoint Plaintiff as representative of the Settlement Class; (5) approve the proposed Notice Plan, Notice, and Claim Form; and (6) set the Final Approval Hearing and related dates as proposed.

## II.    NATURE AND BACKGROUND OF THE CASE

This case rests on alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which prohibits, *inter alia*, initiating any telephone solicitation to a cell phone using an ATDS or an artificial or prerecorded voice. *See* 47 U.S.C. § 227(b). The TCPA's prohibition against auto dialed calls applies to both voice calls and text messages. *See Murphy v. DCI Biologicals Orlando, LLC,* 797 F.3d 1302, 1305 (11th Cir. 2015) (citing In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003)). The TCPA provides a private cause of action to persons who receive such calls or texts. *Id.*

Plaintiff is an individual residing in New Hampshire whose cellular telephone number has been called with unsolicited messages for years. On September 13, 2017, Plaintiff filed a lawsuit against Revenue Frontier and National Tax Experts, LLC in the United States District Court for the District of New Hampshire, Case No. 1:17-cv-00411-PB. On December 1, 2017, Plaintiff filed a First Amended Class Action Complaint dropping National Tax Experts, LLC as a defendant and adding U.E.G. Incorporated, Supreme Data and Adomanis as defendants (Dkt. No. 18).[3] Plaintiff

---

[3] Plaintiff subsequently voluntarily dismissed U.E.G. Incorporated as a defendant without prejudice due to an inability to serve process (Dkt. 74).

alleged that Defendants violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by causing unsolicited text messages to be sent to the cellular telephone numbers of Plaintiff and others using an automatic telephone dialing system.  Plaintiff further alleged that Revenue Frontier is vicariously liable for those text messages.

On May 2, 2018, Revenue Frontier filed a cross-claim against Supreme Data and Adomanis, and a counterclaim against Plaintiff (Dkt. No. 69).  On June 22, 2018, Revenue Frontier filed an Amended Counterclaim against Plaintiff (Dkt. No. 78). On September 26, 2018, the Court granted Plaintiff's motion to dismiss Revenue Frontier's counterclaim and dismissed said counterclaim without prejudice (September 26, 2018 Minute Entry and Oral Order).

On January 9, 2019, Plaintiff filed a Revised Second Amended Class Action Complaint against Revenue Frontier, Supreme Data, and Adomanis (Dkt. No. 88). On Mach 5, 2019, Plaintiff, on behalf of himself and the class he sought to represent and certify, demanded payment from Revenue Frontier, Revenue Frontier's insurance carrier (AXA Insurance Company), and W4 for the TCPA claims alleged in the Litigation.

On June 19, 2019, the Court, over Revenue Frontier's objection, granted Plaintiff's motion for class certification, and certified the following class:

> (1) All persons in the United States who are the users or subscribers of the approximately 18,937 cellular telephones identified in Anya Verkovshkaya's report (2) to which cellular telephone numbers a text message was sent (3) using the SDC Messaging Application, employing the Sendroid software (4) within four years of the filing of the complaint.

(Dkt. No. 115.)

The Litigation has been actively litigated.  Plaintiff's claims survived Revenue Frontier's motion to dismiss, and the parties engaged in discovery and expert discovery, taking multiple depositions, and litigated class certification challenges.

This Settlement was achieved over the course of three mediations, complicated by contributions from multiple parties and insurers. *Declaration of Edward Broderick* ¶ 7. On July 24, 2019, the Parties engaged in a day-long, in-person mediation session with Peter K. Rosen, Esq., a mediator with JAMS ADR in Los Angeles, California, but were unable to reach a settlement. *Id.*. The Parties, however, agreed to a second mediation to allow further assessment by Revenue Frontier's insurer and W4's insurers. *Id.* ¶ 8

On September 5, 2019 the Parties engaged in a second mediation, again with Mr. Rosen, in New York City. The Parties made some progress but did not reach a settlement. The Parties thereafter continued to negotiate through counsel, and agreed to a third mediation between the Parties, and the insurers of the Defendants and W4. That third mediation was held on October 16, 2019, again with Mr. Rosen, between the Parties and insurers.  At this third mediation, a settlement in principle was reached. *Id.*

Defendants and W4 always denied liability and continue to do so.  *Id.* ¶ 9. Defendants and W4 maintain that they have substantial factual and legal defenses to all claims and class allegations in the Litigation.  *Id.* Defendants and W4 specifically deny that any automated dialers were used to text or call Plaintiff or class members without their prior express written consent; that they violated the TCPA; and that Plaintiff and class members are entitled to any relief.  *Id.* Defendants and W4 further contend that the allegations contained in the Revised Second Amended Complaint are not amenable to class certification.  Revenue Frontier expressly denies that it is vicariously liable for any alleged conduct by the other Defendants and W4.  *Id.* Nevertheless, without admitting any liability or wrongdoing whatsoever, Defendants and W4 agreed to the terms of this Agreement solely to avoid the further expense, inconvenience, and distraction of burdensome and

protracted litigation and to resolve all issues relating to the subject matter of the Released Claims (as defined below) in the Litigation.

## III.    THE PROPOSED SETTLEMENT

Pursuant to the Settlement Agreement, Plaintiff seeks certification of the following Settlement Class for settlement purposes only:

> (1) All persons in the United States who are the users or subscribers of the approximately 18,937 cellular telephones identified in Anya Verkovshkaya's report (2) to which cellular telephone numbers a text message was sent (3) using the SDC Messaging Application, employing the Sendroid software (4) within four years of the filing of the complaint.

Agreement ¶ 2.39. The proposed Settlement establishes a non-reversionary $2,100,000.00 Settlement Fund, which will exclusively be used to pay: (1) cash settlement awards to Settlement Class Members; (2) Settlement Administration Expenses; (3) court-approved attorney's fees of one-third of the total amount of the Settlement Fund, in addition to out of pocket expenses; and (4) a court-approved incentive award to the Class Representative of up to $25,000. (Agreement ¶2.23 2 and ¶16.3). Each Settlement Class Member with a known address (which is true for the overwhelming majority of the Settlement Class Member) will receive an equal *pro rata* amount of the Settlement Fund after all Settlement Administrative Expenses, Incentive Awards, and Fee awards are paid out of the Settlement Fund. If all the attorneys' fees, expenses, incentive award and Settlement Administration Expenses are approved as requested, Plaintiff's counsel estimate that the average Settlement Class Member payment would between approximately $50.00-$60.00.

### A.    Opt-Out and Objection Procedures

Persons in the Settlement Class will have the opportunity to exclude themselves from the Settlement or object to its approval. (Agreement ¶12). The procedures and deadlines for filing Requests for Exclusion and objections will be conspicuously listed in the Class Notice and on the

Settlement Website. The Class Notice informs Settlement Class Members that they will have an opportunity to appear and have their objections heard by this Court at a Final Approval Hearing. The Notice also informs Settlement Class Members that they will be bound by the release contained in the Settlement unless they timely exercise their opt-out right. (Agreement ¶, 2.12 ¶12.5).

**B.   Release**

The release is appropriately tailored to this case involving alleged violations similar to those alleged and is limited to those Settlement Class Members identified in the Class List, which is compiled of calling data exchanged in discovery. In exchange for settlement benefits, the Settlement Class Members who do not timely opt out of the Settlement will release the "Released Parties" from any and all claims arising from telemarketing by or on behalf of the Released Parties and is further limited only to the phone numbers contained on the Class List. (Agreement. ¶5).

**C.   Class Representative Incentive Award**

If approved by the Court, the Plaintiff will receive an incentive award of $25,000 from the Settlement Fund. Mr. Clough was named as a counterclaim defendant for fraud, responded to interrogatories and document requests and sat for a full day deposition. This award will compensate Plaintiff for his time and effort and for the risk he undertook in prosecuting this case. (Agreement. ¶13.2).

**D.   Attorneys' Fees and Costs**

If the settlement receives preliminary approval, Plaintiff's Counsel will apply to the Court for an award of attorneys' fees in the amount of up to one-third of the total amount of the Settlement Fund in addition to out of pocket expenses. As Plaintiff's Counsel will address in their fee application, an award of attorneys' fees and costs will compensate Plaintiff's Counsel for the work already performed in relation to the settled claims, as well as the remaining work to be performed

in documenting the Settlement, securing Court approval of the Settlement, making sure the Settlement is fairly implemented, and obtaining dismissal of the action. (Agreement. ¶16.1). Plaintiff's fee application will also address the reasonableness of the requested fee award.

      **E.**    **Remaining Funds**

Any amount remaining in the Settlement Fund after paying all approved Claim Forms, Settlement Administration Expenses, and any Fee Award and Incentive Award will be distributed to a Court-approved *cy pres* recipient. The Parties propose the National Consumer Law Center as an appropriate recipient. (Agreement. ¶5.6.2).

**IV.**    **NOTICE AND SETTLEMENT ADMINISTRATION**

Settlement Administration Expenses will be exclusively paid from the Settlement Fund. The Parties have agreed upon, and propose that the Court approve, the nationally-recognized class action administration firm AB Data to be the Settlement Administrator, to implement the Class Notice, and to administer the Settlement, subject to review by counsel and the Court. (Agreement. ¶6).

The threshold requirement concerning class notice is whether the means employed to distribute the notice was reasonably calculated to apprise the class of the pendency of the action, of the proposed settlement, and of the class members' right to opt out or object. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 159, 173 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). The mechanics of the notice process are left to the discretion of the court, subject only to the broad "reasonableness" standards imposed by due process. In this Circuit, it has long been the case that a notice of settlement will be adjudged adequate where the notice announces the date of the settlement hearing, outlines the allegations prompting the litigation, and summarizes the settlement terms. *See Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974).

The proposed Notice more than satisfies all requirements. The language of the Class Notice was negotiated and has been agreed to by the parties. The proposed Notice is written in simple terminology and includes: (1) a description of the Class; (2) a description of the claims asserted in the class actions; (3) a description of the Settlement; (4) the deadlines for filing a claim form and/or for exercising the right to opt-out (including limitation on the opt-out right); (5) the names of counsel for the class; (6) the fairness hearing date; (7) an explanation of eligibility for appearing at the fairness hearing; and (9) the deadline for filing objections to the settlement.

The contents of the proposed Notice are more than adequate. It provides Class Members with sufficient information to make an informed and intelligent decision whether to object to the Settlement. As such, it satisfies the content requirements of Rule 23. *See e.g. In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D. Me. 2003) ("notice must describe fairly, accurately and neutrally the claims and parties in the litigation, the terms of the proposed settlement, and the options available to individuals entitled to participate, including the right to exclude themselves from the class").

The dissemination of the Notice satisfies all due process requirements. The Settlement Agreement provides for notice to the class through first class mailing of the Class Notice. Class Members with known addresses who receive mailed notice will not need to make a claim. Any individuals who did not receive a mailed notice but still believe themselves to be in the Settlement Class will be able to file a claim form. The Notice outlines the allegations of the case, advises class members of their right to opt out, and will announce the date of the fairness hearing. In sum, the contents and dissemination of the proposed Notice constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Rule 23

**V.      The Settlement Agreement Should Be Preliminarily Approved As Fair, Reasonable And Adequate**

As a general matter, settlements "will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977). The First Circuit Court of Appeals has long recognized that there is an overriding public interest in favor of settling class actions, *Lazar v. Pierce,* 757 F.2d 435, 439 (1st Cir. 1985); *see In re Lupron Mktg. and Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005) ("the law favors class action settlements"). In addition, "[t]here is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for Court approval." H. Newberg, A. Conte, Newberg on Class Actions (4th ed. 2002), §11.41; *see In re Employee Benefit Plans Secs. Litig.*, No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993) ("[t]he court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement"). Although the trial court must consider the terms of a class action settlement, "'[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.'" *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir. 1999).

A district court "can approve a class action settlement if it is fair, adequate and reasonable." *City Pshp. Co. v. Atlantic Acquisition*, 100 F.3d 1041, 1043 (1st Cir. 1996), quoting *Durrett v. Housing Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *see also* Fed. R. Civ. P. 23(e)(2) (a court may approve a class action settlement if it is "fair, reasonable, and adequate."). At the preliminary approval stage, this Court need only be satisfied that there is "probable cause" to believe that the settlement is fair and reasonable. *Id.* The Manual For Complex Litigation sets forth the procedures for preliminary approval of settlements:

> *If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.*

Manual, § 21.632.

Thus, the question for this Court is whether the settlement falls well within the "range of possible approval," *id.,* and is sufficiently fair, reasonable and adequate to warrant dissemination of notice apprising class members of the proposed settlement and to establish procedures for a final settlement hearing under Rule 23(e). *See Durrett,* 896 F.2d at 604. The initial presumption of fairness of a class settlement may be established by showing (1) That the settlement has been arrived at by arm's-length bargaining; (2) That sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently; and (3) That the proponents of the settlement are counsel experienced in similar litigation. Newberg, at §11.41.

In determining whether class action settlements should be approved, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. [Citation omitted] . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n.14 (1981). In assessing the fairness, reasonableness, and adequacy of a settlement, courts view the facts in the light most favorable to the settlement. *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996). The court "should not substitute [its] own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee,* 616 F.2d 305, 315 (7th Cir. 1980). Fed. R. Civ. P. 23 provides that, where

a proposed settlement would bind class members, a court may only approve it after a hearing and

upon a finding that it is fair, reasonable, and adequate, after considering the following factors:

    (A)   the class representatives and class counsel have adequately represented the class;

    (B)   the proposal was negotiated at arm's length;

    (C)   the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv)  any agreement required to be identified under Rule 23(e)(3); and

    (D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Courts also consider: (1) the strength of the case for plaintiff on the merits,

balanced against the amount offered in settlement; (2) the complexity, length, and expense of the

litigation; (3) the presence or absence of collusion in reaching a settlement; and (4) the stage of

the proceedings and the amount of discovery completed. *Synfuel Techs., Inc.*, v. DHL Express

(USA), Inc. 463 F.3d 646, 653 (7th Cir. 2006); *see also Armstrong*, 616 F.2d at 314; *Isby*, 75 F.3d

at 1199.

      As set forth herein, the Settlement warrants preliminary approval so that persons in the

Class can be notified and provided an opportunity to voice approval or opposition.


### A.    The Settlement Resulted From Arm's Length Negotiations -- It is Not the Product of Collusion

      The requirement that a settlement be fair is designed to protect against collusion among the

parties. The Plaintiffs first note that "[t]here is usually an initial presumption of fairness when a

proposed class settlement, which was negotiated at arm's-length by counsel for the class, is presented for court approval." Newberg at §11.41. This Settlement was negotiated at arm's length by knowledgeable and experienced counsel over the course of three mediations with Peter Rosen, Esq., nationally recognized mediator with particular experience in insurance coverage disputes, the first of which was in Los Angeles, California, with two following in New York City. *See* Declaration of Edward A. Broderick, attached as Exhibit 2 at ¶ ¶ 7-8. The nature of these mediation sessions, the experience of counsel as longstanding class-action attorneys, the involvement of a skilled mediator and the fair result reached are illustrative of the arm's-length negotiations that lead to the Settlement Agreement.

**B.     The Factual Record Was Well Developed Through Independent Investigation**

Throughout the settlement discussions, the parties engaged in formal and informal discovery. Among other things, Plaintiff obtained the texting records and discovery relating to the multi-party telemarketing relationship at issue. Plaintiff's and Revenue Frontier's counsel also deposed Defendant William Adomanis, who personally ran the texting campaign in Florida. Through this discovery, Plaintiff was able to assess the strengths and weaknesses of the case. By the time the Settlement was reached, Plaintiff and Class Counsel, who are experienced in bringing TCPA class actions, had "a clear view of the strengths and weaknesses" of their case. *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985). In sum, through their own investigation, Plaintiff and Class Counsel are in a strong position to make an informed decision on the merits of recommending the settlement, as they had a "full understanding of the legal and factual issues surrounding [the] case." *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996). This strongly supports settlement approval.

### C.     The Settlement Was Negotiated by Experienced Counsel

Counsel for the Plaintiff are experienced in class action litigation. As a result of the evaluation of counsel, the Settlement was reached as a means of fully resolving the cases without the burden or risks attendant with further litigation. See Declarations of Edward Broderick (Ex. 2), Roger Phillips (Ex. 3), Matthew McCue (Ex. 4) and Alex Washkowitz (Ex. 5).

### D.     Continued Litigation Came With Significant Risks

The expense, complexity and duration of litigation are significant factors considered in evaluating the reasonableness of a settlement. Here, litigating the case through trial would undoubtedly be time-consuming and expensive. As with most class actions, this case is complex. Absent settlement, litigation could likely continue for years before Plaintiff would see any potential recovery. That a settlement would eliminate the delay and expenses strongly militates in favor of approval. *See Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984). Although Plaintiff here believes that he would ultimately prevail on the merits at trial, success is far from assured. If approved, the Settlement would bring a sure end to what would be contentious and costly litigation with substantial risk. One of those risks focuses on the question of whether Supreme Data Connections, LLC's dialing system, which Plaintiff contends is a predictive dialer, is an "Automatic Telephone Dialing System" under the TCPA. As an initial matter, on July 10, 2015, the FCC released an omnibus declaratory ruling clarifying numerous relevant issues affecting the TCPA, including definition of an ATDS under the statute[4]—which was overturned in part in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). Following the D.C. Circuit's decision in *ACA Int'l* courts have been split on what constitutes an ATDS under the TCPA.

There are a substantial number of cases finding that dialers that do not generate their own

---

[4]     *See* https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1.pdf.

numbers to call or text do not qualify as an ATDS. For example, in *Pinkus v. Sirius XM Radio,*

*Inc.*, No. 16 C 10858, 2018 U.S. Dist. LEXIS 125043 (N.D. Ill. July 26, 2018) the Court held that

an ATDS must generate random numbers to be called:

> As relevant here, the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service ... ." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id...*
>
> *ACA International* did not itself articulate a definitive view of which functions characterize an ATDS. *See* 885 F.3d at 703 (noting that "[i]t might be permissible" for the FCC to conclude *either* that a device can "qualify as an ATDS only if it can generate random or sequential numbers to be dialed" *or* that it can "so qualify even if lacks that capacity"). Given this, the parties' dispute can be reduced to the question whether a predictive dialing device that calls telephone numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—satisfies [*25] the statutory definition of ATDS.
>
> So, the phrase "using a random or sequential number generator" necessarily conveys that an ATDS must have the capacity to generate telephone phone numbers, either randomly or sequentially, and then to dial those numbers. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015) (holding that "'random or sequential' number generation ... refers to the numbers themselves rather than the manner in which they are dialed"). This interpretation finds support in the FCC's pre-2003 understanding of the statutory term ATDS. The 1992 Order expressed the view that "[t]he prohibitions of § 227(b)(1)"—which, as noted, make it unlawful to use an ATDS under certain conditions—"clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." 7 FCC Rcd. 8752, 8776 ¶ 47. And in a follow-on 1995 ruling, the Commission described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 ¶ 19 (1995). The FCC's pre-2003 understanding of § FCC(a)(1) thus reinforces what its plain text shows—that equipment qualifies as an ATDS only if it has the capacity to function ... by generating random or sequential telephone numbers and dialing those numbers.

*Pinkus* at *4, 29-31 (N.D. Ill. July 26, 2018). The Third Circuit Court of Appeals adopted a similar

stance in *Dominguez v. Yahoo, Inc.*:

- 14 -

The decision in *ACA International* has narrowed the scope of this appeal. In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling. Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer. The only remaining question, then, is whether Dominguez provided evidence to show that the Email SMS Service had the present capacity to function [**6] as [an] autodialer…

Ultimately, Dominguez cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers. On the contrary, the record indicates that the Email SMS Service sent messages only to numbers that had been individually and manually inputted into its system by a user. There can be little doubt that Dominguez suffered great annoyance as a result of the unwanted text messages. But those messages were sent precisely because the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation. The TCPA's prohibition on autodialers is therefore not the proper means of redress.

*Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119, 121 (3d Cir. 2018). The Second Circuit seems to agree with the Third Circuit in *King v. Time Warner Cable Inc*., 894 F.3d 473, n.5 (2d Cir. 2018), although *King* remanded the ATDS issue to the District Court for further factual findings.

It is undisputed that the SDC Messaging Application using the Sendroid software used in this case does not "create" or generate the telephone numbers to which it sends texts out of thin air. Instead, it takes the telephone numbers purchased and generates a sequence of phone numbers for texts that is carried out when Defendant's telemarketers execute a computer command to begin the textng campaign. The dialer then sends those texts. The Eleventh Circuit has adopted a version of the *Pinkus* analysis, *Glasser v. Hilton Grand Vacations, LLC, 202 U.S. App. LEXIS 2481* (January 27, 2020), as did the Seventh Circuit, *Gadelhak v. AT&T Services, Inc.*, 7th Circuit Court of Appeals, Action No. 19-1739 (February 19, 2020).

If this Court were to agree with the Court in *Pinkus, Glasser* or *Gadelhak* or if the First Circuit Court of Appeals were to adopt that approach to defining an ATDS, no one, including the Plaintiff, would have been able to recover *anything at all*. Other courts have adopted the same

position as Judge Feinerman and Third Circuit Court of Appeals. *Marshall v. CBE Group, Inc*., Case No. 2:16-cv-02046-GMN, 2018 WL 1567852 (D. Nev. Mar. 30, 2018); *Herrick v. GoDaddy.com LLC*, No. CV-16-00254-PHX-DJH, 2018 WL 2229131 (D. Ariz. May 14, 2018); *Gary v. TrueBlue, Inc.*, Case No. 17-cv-10544, 2018 WL 3647046 (E.D. Mich. Aug. 1, 2018); *Keyes v. Ocwen Loan Servicing*, No. 17-cv-11492, 2018 U.S. Dist. LEXIS 138445, at *15 (E.D. Mich. Aug. 16, 2018).

In addition, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards — even after a plaintiff has prevailed on the merits — on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons – Algonquin, Inc.*, No. 09-910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights …. Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see Phillips Randolph Enters., LLC v. Rice Fields*, No. 06-4968, 2007 WL 129052, at *3 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

Moreover, the narrative of the Defendants' telemarketing compliance efforts could present a case for reduction of any damages awarded after trial and some courts have applied this principle in the TCPA context. For example, the Court explained in *Golan v. Veritas Entm't, LLC* before reducing the damages awarded in that TCPA class action lawsuit to $10 a call:

> Three courts have reduced damages awards in TCPA cases. In *Texas v. American Blastfax, Incorporated*, plaintiff, the state of Texas, brought suit against defendants, American Blastfax, Incorporated and two of its officers and directors. 164 F.Supp.2d 892, 894 (W.D. Tex. 2001). The district court held defendant Blastfax

had violated the TCPA by sending unsolicited intrastate fax advertisements. *Id.* at 894. Defendants presented evidence the average cost of receiving an unwanted fax is seven cents per page. *Id.* at 900. Although it stated the TCPA provides for liquidated damages of $500 for each violation, the district court found it would be inequitable and unreasonable to award that amount for each violation. *Id.* Instead, the district court interpreted the provision as providing for "up to" $500 per violation. *Id.* The district court found a reasonable award was seven cents per violation, which it trebled because defendants' conduct was willful and knowing, for a total amount of $495,375…

The next case which reduced damages for TCPA violations is *Maryland v. Universal Elections, Incorporated*, 862 F.Supp.2d 457 (D. Md. 2012). The state of Maryland brought a civil enforcement action against Universal Actions, Incorporated and two individuals, alleging defendants violated the TCPA by making 112,000 prerecorded telephone calls to residents on Election Day. *Id.* at 459. The district court found defendants violated the TCPA. *Id.* at 463-464. The base damages award could have been $34,000,000 and could have exceeded one hundred million dollars if trebled, because the violations were knowing. *Id.* at 464. The state of Maryland requested $10,424,550. *Id.* at 465. The district court awarded $1,000,000. *Id.* at 466. The district court reasoned "a $10 million penalty is disproportionate to the size of the company and the defendants' presumptive ability to pay." *Id.*

The third case is *United States v. Dish Network, LLC*, No. 09-3073, 256 F. Supp. 3d 810, 2017 U.S. Dist. LEXIS 85543, 2017 WL 2427297 (C.D. Ill. Jun. 5, 2017). Plaintiffs, the United States and the States of California, Illinois, North Carolina, and Ohio, alleged defendant, Dish Network, LLC, violated the TCPA, as well as several state laws and regulations, by placing telephone calls to telephone numbers on the do-not-call list. 2017 U.S. Dist. LEXIS 85543, [WL]at *1. After a bench trial, the Central District of Illinois entered judgment in favor of the plaintiffs and against the defendant. *Id.* Plaintiffs asked for a damages award of $2.1 billion. 2017 U.S. Dist. LEXIS 85543, [WL] at *139. The district court awarded civil penalties and statutory damages of $280,000,000, approximately 20 percent of the defendant's after-tax profits for 2016, finding this amount was "appropriate and constitutionally proportionate, reasonable, and consistent with due process." *Id.* The district court further reasoned "[t]he amount represents a significant penalty for the millions and millions of Do-Not-Call violations caused by Dish over years and years of careless and reckless conduct." *Id.* Finally, the district court stated "[t]he injury to consumers, the disregard for the law, and the steadfast refusal to accept responsibility require a significant and substantial monetary award."

*Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 U.S. Dist. LEXIS 144501, at *6-9

(E.D. Mo. Sep. 7, 2017).

- 17 -

Aside from the litigation risks, defendants Adomanis and Supreme Data Connections, LLC made clear that they were without the financial means to pay a full judgment had this matter proceeded to trial and through appeal with a result favorable to the Plaintiff. The financial condition of a Defendant is an important factor in evaluating the fairness of a proposed settlement. *See e.g. Krimes v. JPMorgan Chase Bank, N.A.*, No. 15-5087, 2017 U.S. Dist. LEXIS 79434 * 23-25 (E.D. Pa. May 24, 2017) (recognizing financial inability of defendant to pay a larger judgment as a relevant factor for consideration on preliminary approval of a class action settlement). Revenue Frontier, although solvent, asserted its own defense that it could not be held vicariously liable for the actions of third partiers that it denied acted as its agents.

By reaching this Settlement, the parties will avoid protracted litigation and will establish a means for prompt resolution of Class Members' claims. These avenues of relief provide a benefit to Class Members. Given the alternative of long and complex litigation before this Court, the risks involved in such litigation, and the possibility of an appeal, the availability of prompt relief under the Settlement is highly beneficial to the Class.

## VI.   The Court Should Certify a Settlement Class

The Supreme Court has made clear that even when the Court determines that a settlement is fair under the strictures of Fed. R. Civ. P. 23(e), it still must consider whether a class can be preliminarily certified under Rules 23(a) and (b). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-21 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999).

### A.   Rule 23(a)'s Requirements Are Satisfied

#### 1.   Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous the joinder of all members is impracticable." Fed. R. Civ. P. 23(a); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). The standard of impracticability does not mean "impossibility" but only difficulty

or inconvenience of joining all members of the class. The issue is not the numerical size of the class but, as explicitly stated in Rule 23(a)(1), that joinder is impracticable. *Hatisberry v. Lee*, 311 U.S. 32, 41 (1941).

The proposed settlement class encompasses over 18,937. This number of class members demonstrates that joinder is simply a logistical impossibility. *See, e.g., Gorsey v. I.M. Simon & Co.*, 121 F.R.D. 135, 138 (D. Mass. 1988) (800 to 900 member class made joinder impracticable).

### 2.  Commonality

Rule 23(a)(2) commonality exists "if there are questions of law or fact common to the class." *Swack*, 230 F.R.D. at 259. This requirement is construed permissively, and is often easily met. *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (describing the commonality requirement as a "low hurdle"); *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) ("the commonality requirement ordinarily is easily met"). Rule 23(a)(2) does not require that every single question of law or fact raised in the litigation must be common. *In re Polymedia Corp. Sec. Litig.*, 224 F.R.D. 27, 35 (D. Mass. 2004). Rather, commonality is satisfied by showing a single issue common to all members of the class. *Payne*, 216 F.R.D. at 25.

Legal commonality is present here. The questions of law in this litigation are absolutely identical among the class members. All class members received virtually identical texts promoting tax debt relief goods or services. Common to the class was whether such calls were in violation of the TCPA.

### 3.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class ...". The requirement is satisfied if the "class representative[s] ... 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor*

*Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). To be typical within the meaning of the rule simply requires that the claims of the named plaintiffs arise from the same types of conduct which give rise to the class members' claims. *Burstein v. Applied Extrusion Technologies, Inc.,* 153 F.R.D. 488, 491 (D. Mass. 1994); *Adair v. Sorenson*, 134 F.R.D. 13, 17 (D. Mass. 1991). Typicality does not require that the named plaintiffs' claims be identical to those of the class. Under the Rule's "permissive" standard, representative claims are typical if they are reasonably co-extensive with those of absent class members. *Swack*, 230 F.R.D. at 260. As long as the named representative's claim arises from the same event, practice, or course of conduct that forms the basis of the class claims, and is based upon the same legal theory, varying factual differences between the claims or defenses of the class and the class representative will not render the named representative's claims atypical. *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 325 (D. Mass. 1997).

The class members in this case were all similarly effected by Defendants' allegedly illegal telemarketing practices.

### 4.    Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This element is generally characterized as an inquiry into whether the attorneys together with the named plaintiffs will act diligently on behalf of the class. *Amchem*, 521 U.S. at 625; *Duhaime*, 177 F.R.D. at 64. The First Circuit employs a two-part test in analyzing adequacy: (1) the class representatives' interests must not conflict with the interests of the class; and (2) class counsel is experienced, qualified and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985); *Berman v. Narragansett Racing Ass'n, Inc.,* 414 F.2d 311, 317 (1st Cir. 1969).

- 20 -

Both requirements are met. First, Plaintiffs' counsel are experienced class action lawyers whose combined experience in TCPA class actions, and current diligence and commitment to this litigation, will more than adequately protect the interests of the class. Exhibits 2-5, Declarations of Counsel. Second, there is no conflict or antagonism whatsoever between the Plaintiff and the Class Members. All share a united interest in putting an end to Defendant's allegedly illegal telemarketing practices, and all seek redress for the harm they allegedly suffered as a result of the practices.

### B.     Rule 23(b)'s requirements are satisfied

Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### 1.     Predominance

The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem*, 117 S. Ct. at 2249. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778. A finding of typicality goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality. *Rossini v. Olgivy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986); *Falcon*, 457 U.S. at 157 n.13 (commonality and typicality tend to merge). "As is now well recognized, the class action commonality criteria are, in general, more easily met when a disparate impact rather than a disparate treatment theory underlies a class claim." *Garcia v. Johanns*, 444 F.3d 625, 632 (D.C. Cir. 2006) (quoting *Stastny v. So. Bell Tel. & Tel. Co.*, 628 F.2d 267, 274 n.10 (4th Cir. 1980).

Predominance exists here. As discussed above, virtually all of the issues of law and fact are identical among the class members. Under these circumstances, the requirements of Rule 23(b)(3) are present. The courts have routinely found predominance of common questions where the claims relate to a common course of conduct. *See, e.g., Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (predominance requirement satisfied by "sufficient constellation of common issues [that] bind class members together" and "cannot be reduced to a mechanical, single-issue test"); *Duhaime*, 177 F.R.D. 54, 64 (D. Mass. 1997) (requirement is "readily met in cases alleging consumer … fraud" where claim alleges single course of conduct, quoting *Amchem*, 521 U.S. at 625).

## 2.      Superiority

The superiority requirement is met as well. A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. Four factors are considered in determining whether a class action is superior to individual litigation: (1) whether individuals have a strong interest in controlling potentially separate actions; (2) a class action's effect on competing litigation involving members of the class; (3) whether resolution of the case in a single forum is desirable; and (4) the potential difficulties that management of a class action presents.

The superiority considerations argue in favor of certification. Certification allows the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Here, it would be uneconomic for individuals to pursue TCPA claims on their own, and therefore unlikely they will do so. *See Smilow*, 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) certification is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."); *Grace v.*

- 22 -

*Perception Technology, Inc.*, 128 F.R.D. 165, 171 (D. Mass. 1989); *Randle v. SpecTran*, 129 F.R.D. 386 (D. Mass. 1988).

Finally, the difficulties of managing a class action are vitiated by the fact of this settlement. When "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620, 117 S. Ct. at 2248.

## VII.   SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, the Court must set a final approval hearing date, dates for mailing and publication of the Notice and deadlines for filing claims, objecting to the Settlement, opting out of the Class, and filing papers in support of the

Settlement. The Parties propose the following schedule:

| | |
|---|---|
| Notice mailed to Class and Published on the Website ("Notice Date") | 45 Days After Entry of Preliminary Approval Order |
| Deadline for filing of Plaintiff's Motion for Attorneys' Fees and Costs and Incentive Award | 30 Days After the Notice Deadline |
| Claim, Objection and Opt Out Deadlines | 90 Days After the Notice Deadline |
| Deadline for filing papers in support of final approval of the Settlement. | 100 Days After Notice Deadline |
| Deadline for Settlement Administrator to Provide Class Counsel with Proof of Class Notice, Identifying Number of Requests for Exclusion and Number of Claims Received | 7 Days after Opt Out Deadline |
| Class Counsel shall File with the Court One or More Declarations Stating that they Have Complied with CAFA Notice Obligations | 10 Days Prior to Final Approval Hearing |
| Final Approval Hearing | At the Court's convenience but at least 120 dates after the Notice Deadline |

## VII.   CONCLUSION

For the reasons set forth above and the entire record in this litigation, the Settlement warrants this Court's preliminary approval, and Plaintiff's Counsel respectfully requests that the motion be granted. A proposed Preliminary Approval Order (also attached to the Settlement Agreement as an exhibit) is submitted as Exhibit 6 hereto.

Plaintiff,
By Counsel,

*/s/ Edward A. Broderick*
Edward A. Broderick
Broderick Law, P.C.
99 High St., Suite 304
Boston, MA 02110
(617) 738-7080
ted@broderick-law.com

Roger B. Phillips, (Bar. No.2018)
Phillips Law Office, PLLC
104 Pleasant Street
Concord, NH 03301
(603) 225-2767 (ph)
(603) 226-3581 (fax)
roger@phillipslawoffice.com

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, Massachusetts 01760
(508) 655-1415
mmccue@massattorneys.net

Alex M. Washkowitz
CW Law Group, P.C.
188 Oaks Road
Framingham, MA 01701
alex@cwlawgrouppc.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send notification to all attorneys of record.

*/s/ Edward A. Broderick*
Edward A. Broderick